Good morning, your honors. My name is Randy Hironaka. I represent Blaine Jacintho, the appellant in this matter. This trial was essentially a trial by text message. I know you guys have read the submissions and you know it goes without saying that the meaning of the text messages greatly affected to Mr. Jacinto's detriment, both the government's, the meaning, the interpretation, and the government's case-in-chief, as well as Mr. Jacinto's entrapment defense in this case. Because ultimately what this case came down to was the meaning of those text messages and they were essentially laundered through the government's case agent who was the last witness to testify at trial. What's your strongest argument there was an evidentiary ruling error here? It was basically admitting, allowing that task force officer, the government's case agent, to testify as to the meaning of those text messages. Both the text messages on the cooperating sources phone as well as the text messages to Jacinto's phone. All of them? Are there particular ones you wanted to call our attention to? You know, it was primarily all of them. Some of them are in plain speak, but very few of them. A lot of them were... What's the most egregious example that you'd like to call our attention to, please? I think anyone, like when they're referring to, for example, they're referring to water, you know, they're using terms that just don't match up with with drug terms and the case agent being able to testify and say what those are. Because without that, obviously the government has a burden to prove that there's drugs distributed in this case and the history of the interaction between the cooperating source as well as the government, as well as the government's, excuse me, as well as the appellant had an impact, I mean matters. And so that's, those are the most egregious, is the meaning of those text messages. And I couldn't help but obviously overhear the last case. The government's cooperating source in this case didn't testify because he had essentially violated the terms of his agreement with the government. He engaged in further transactions with the appellant in this case. So the government made a decision not to call him as a witness and so they made basically the confrontation, obviously a problem, as well as the government's calling the case agent to interpret these text messages. That's, that's the legal problem. That's before the court. And again, not just with respect to the government's case-in-chief, but with respect to Mr. Jacinto's defense as well. The, so from that standpoint, obviously the issue is not harmless. I know that the government does respond that there is a, that basically there's a, they talk a lot about admissibility in this case, but the focus that I'm asking your honors to focus on is, it's the meaning. It's not the admissibility necessarily of the text messages, although we have arguments for why some of them shouldn't have been admitted, but it's the meaning of the text messages that's the real problem. Because again, they can't prove their case without proving the meaning of those text messages and the way they did that was improper and robbed Mr. Jacinto of confrontation. The, I'm gonna jump over for right now because I would like to reserve at least three minutes for rebuttal. I'm gonna skip over unless your honors have any question about the, the improper comments made by the government's attorney during closing argument. As to the issue of supervisor manager at sentencing, you know, the, the focus I have here is basically with respect to Ms. Boggs. So there were exactly and only five participants in the conspiracy identified or found by the court. One of them was Ms. Boggs and there is just not enough in the record with respect to Ms. Boggs. I think the furthest it went is that she maybe arranged a meeting with the appellant and and a source of supply by the name of Amigo or who went by the name Amigo and beyond that, there's just, there's simply no evidence that she was a part of the conspiracy in this case. The other person is Lucas Bukowski. Understandably, you know, the, the argument for his participation is different from Ms. Boggs, but I will say that the evidence that came out at trial was essentially that a package was sent by Mr. Jacinto to Bukowski's address. He didn't pick it up, Mr. Bukowski didn't pick it up, didn't touch it, he didn't go near it. He essentially had nothing to do with it. So beyond that, to describe him as a participant in this conspiracy also falls short of the government's burden even by a preponderance standard. There is also the final issue with respect to the, the purity policy. I, I know this was also a part of the last case that was, that was just heard. You know, I, the, the government responded that basically the court varied downward and thus the sentence was reasonable. You know, I think the issue here is that, because unlike the other, the last case, in this case the court did talk about how the guidelines were just simply too high, but there's no specific finding as to whether or not there was a downward variance based on, you know, the drug guidelines, specifically with respect to the purity policy, with respect to methamphetamine. So even though we're talking about a downward variance that ultimately did result in this case, we don't know why. That's, that's not indicated in the court's, you know, discussion at sentencing. And, and furthermore, even if there were, what we're really talking about here is a different starting point, right? And so if there are other reasons to vary downward, then the starting point based on the purity policy, at least as far as Mr. Jacinto's concern, is that he would have gone from 360 to life to 235 to 293 months. So if there were other reasons to vary, and I'm sure there were, then he'd be looking at, even though his final sentence is still below that 235, he, that's a totally different starting point for which he could have had a sentence driven down even lower. I have a question, if I could, about ER 277. You, you've, you've told me that you're concerned about the, basically the translation, the interpretation of these communications, but there's sort of two layers of communications, right? And ER 277, it says that your client withdrew his objection to the telephone calls and texts between himself and the cooperator. So regardless of who authored those, my understanding is your client did not object to the, the admissibility of those, is that right? Or at least that level of hearsay, that he, what he, what he's, what he's arguing now is, is the next level, that the officer was, was allowed to testify to, about them, right? I'm, I'm trying to think back, my memory's not what it used to be, but, yeah, I believe that, again, that's maybe as to admissibility, but, but the meaning of it is, is different. So it's a different argument, if you're talking about, it sounds like today you're not objecting to the admissibility, and that would be consistent with ER 277. Correct. Okay, so instead you're, you're, I think, making an argument that this person wasn't basically qualified as an expert to provide the interpretation, the translation? That is correct. Okay, and, and your appeal is limited to that issue? So that, that, that's the focus, correct, yes. Did you say, I'm sorry, it's what? That is the focus, yes, it's the meaning, that, that's the appeal, that is the, right. It's that they, they, they needed to, the meaning needed to come from, at a minimum, the cooperating source. Okay, and so why was, why was it improper for, you know, we have cases where there's, sometimes it's foreign language that's being translated, sometimes it's slang that's being translated, and in this case, now that I understand that you're limiting yourself to that issue, why was this officer not qualified, or the correct witness, in order to help the jury with that? You know, there's, there's, I think, maybe certain, if I recall correctly, that we had discussions during trial about, you know, that there might be certain slang terms that are common from, you know, drug conspiracy to drug conspiracy, but, you know, this one contained very unusual terms, and, you know, for a case agent to be able to come in and say, you know, this word means this particular drug, or this word means that particular drug, or means a certain weight, that is simply not, there's, there's no way to meaningfully confront the agent on that. These are communications between the cooperating source and my client, and so the person, it either has to come. So you are, forgive me for interrupting, but you are resting your argument in the confrontation clause? That's correct, yeah, so it's that, those meanings that there's no opportunity to confirm. Thank you for that. Anything further? No, I don't think we have any further questions at this point. Thank you. Good morning, your honors. May it please the court, Aslan Affinito on behalf of the that had just come up. So with respect to the hearsay issue, as an additional matter, the defendant did not object to any, any of these questions about sort of the meaning of the text message, but I think it's, it's also important to know that the vast majority of TFO Lee's testimony simply consisted of him reading these text messages verbatim, which is very clear from reading the entirety of his text, of his testimony. There are portions where he seems to be paraphrasing what the text messages say, or he talks about the messages in the context of the broader investigation, but he wasn't testifying as an expert. He was testifying based on his personal involvement in this investigation. He was the case agent. But it is sort of hybrid-y, right? It's one thing to testify that he's a you know, interprets or translates with the foreign language or slang. And so that's why I think you're straddling the line there. Yes, and so, and I, and I know that there was, there were discussions about this before the court, but here the court had, had considered him a recipient witness. He's testifying about what he actually did in this investigation, what he learned, and some of this when he's talking about he's, you know, when he's talking about the meaning, he's saying, you know, like, it's, it's, it's not really based on expert, you know, coming in out of nowhere. It's based on he was working on this investigation. He knows that there are deals being set up with this particular type of drug. It's methamphetamine. So when he's saying they're using these code words, we know it's methamphetamine because the next day we see them. Can I, can I maybe do it this way? Yeah. Sometimes we see, and there's a, there's a spectrum, right? Sometimes we see cases and the, and the law enforcement officers had direct contact with that case and is also able to testify based upon his experience in this case, but that's how these people, these are the terms these folks use. There's a course of operations and he's had experience with these folks. As opposed to saying, I'm a law enforcement officer and I have an experience with this, you know, E Street gang and Bruce Springs didn't like that, I think. I just went to E Street, sorry, but to, to this particular gang and this is how it operates and I know that from my training experience and, and it doesn't have to do what they, what they did on this occasion, right? So I think what you're telling me and what I'd like is a, as a citation to a place in the transcript where you're, you're going to give me an example where that, that, that this witness was able to testify as a fact witness and explain why he had the ability to, to, to translate these terms based upon his firsthand contact with, with these, this citation. Is that your theory about why this was permissible? Do I understand your theory correctly? Well, so, so I guess as an initial matter, there's, the, the broader point here is there's actually no evidence that he was testifying based on hearsay testimony, that he was. They've waived the hearsay, they've waived the hearsay objections. Okay, but so, well I guess I'd say then, so. He's making a different argument now. Well then I guess I'd say that argument is waived because it was not raised in the briefing that he was testifying as an expert as opposed to a lay witness. That was not. How did the government present this witness? As a, as a, as the case agent, not as an expert witness. Okay, I think that's right. And so that, hence my question. Do you have a place in the transcript, a page where you want to show me that about, or is it, is it your position that you put him up as a fact witness and there wasn't any objection to this, what I'm calling translation? Yes, I, I believe that's right. I, I'm trying to see if there's, well for example, yeah, so I'll try to give you an example. I didn't have any polled in advance of this, but for example, on, at ER 183, there, this is about text messages between Jacinto, the appellant, and Agapai, who's the cooperator. And so here, this was where there was a hearsay objection, which was sustained. They asked what did law enforcement discover had happened or what did you personally discover had happened? The answer was it became clear through text and through corroboration of Mr. Agapai. There's an objection here based on hearsay. It's sustained. So Mr. Agapai's corroboration doesn't come in. And then the question goes to, in your investigation of the phone, did you learn, is that how you learned what you had just said that Mr. Agapai had done deals on the side? And the answer is yes, I found text that indicated Mr. Agapai had done deals on the side. Sorry, ER 183. Apologies. And so this is, yeah, so this is a situation where he's, you know, there was an objection on hearsay grounds. It's sustained. He doesn't testify as to any improper hearsay and instead testifies to his personal knowledge. I reviewed these text messages and I could tell from these text messages that Mr. Agapai was doing deals on the side with the appellant. Is there any objection along the lines of the objection voiced today about . . . it's basically, it could have been packaged as foundation, it could have been packaged as this impermissibly strays into expert opinion. What he's arguing today is that this expert is . . . forgive me, that this witness wasn't properly called to interpret what they meant by some of these terms and the one he used today was water. You heard that. So what's the government . . . how did that roll out or are you relying on the lack of objections? So there were a lack of objections. There's very few. There was a foundation objection at one point which was sustained, so never came into evidence. This is on ER 170 to 171. It was asked in the course of your investigation, were you able to determine what Jacinto's financial agreement was with Amigo, who is a non-cooperating co-conspirator. There's an answer there that Amigo would front drugs to Jacinto. He would distribute them. It appears to be also on front. The objection comes and it's sustained by the court. It says the jurors have heard the text messages and read them. Please move on. This is on ER 170. I'm sorry, Your Honor, I don't know the foundation for this. I'm objecting. Yes. It's a stain that the jurors have heard the text messages and read them. Yes. Yes. So that . . . so I'm saying there there's a foundation that . . . objection here. And then there . . . I mean there were very few objections. There was . . . there was one objection as to sort of, I guess, as to this issue of opinion testimony. So at ER 137 to 38, the question . . . this is about text messages between Jacinto and the non-cooperating co-conspirator Amigo. The question is . . . and so from our review of the conversation so far, based on your investigation, do you know what is being discussed here? He says yes. And what is that? So from my knowledge of the investigation, there's an objection that this is opinion testimony. The court overrules it, says he's a percipient witness. I consider this percipient witness testimony. But from there, he just goes on to . . . he just goes on to talk about the messages themselves. He's not talking about anything . . . I don't believe he's interpreting anything unusual there with respect to that. He's not providing the sort of expert testimony or opinion testimony that would be improper in what follows. And so, I mean, ultimately though, this was . . . it was something where I think here, the text messages . . . you know, I agree with Mr. Hironaka, the text messages were key evidence in this case. But the jury had those text messages verbatim, and that's the majority of what agent . . . or TFO Lee testified about. And . . . I'm not sure why the government accept that you had an objection that was waived. But some of these text messages were authored by a witness who was not presented. The confidential source wasn't presented, right? And he's authored some of these text messages. That's correct. Some of them are party-opponent admissions, but not the responses. And I guess what you're relying on there is that the objection was . . . the hearsay objection was withdrawn. Yes, so there was a motion in Lemonet specifically as to this point. It was covering the opposing party statements by Jacinto. It was covering the cooperator statements by Agapay, which were . . . which we moved in Lemonet to admit on the basis just for the limited purpose of providing context and the effect on the listener. And the jury was instructed specifically on that point, Agapay's text messages are only to be considered for that. They were . . . All of them made during the course of the conspiracy? Or . . . forgive me, were all of them made during the course of the operation agreement? I think there may have been some from before. I don't hold me to that. I think that's correct, but a lot of them were made during the course of the conspiracy, but some of them were made outside of the direction of law enforcement. Obviously Agapay did a deal on the side, and so there were text messages that law enforcement didn't know about until they . . . until TFO Lee sat down and read this phone and they discovered them. That's why he wasn't called to the trial team, but he was not ultimately called to testify. I think you've answered my questions, Judge Desai. I think we don't have any more. Okay. Is there anything else on anything else? No. All right. I will take my leave. Thank you very much for your time. Okay. So just a couple of responses to Your Honor's inquiries of Ms. Afinito. The . . . I think the citation, or at least sort of one of the main parts that you might be looking for when you have the question about whether or not testifying as a fact witness, expert witness, would be the supplemental ERs . . . and I'm sorry, I'm not good with navigating this, but I think it's 22.3 page 75 . . . 22.3 page 75 . . . doesn't sound like the . . . I think it's the third . . . the third volume? Actually, I think it's the second volume and then page 75 is actually . . . I'm looking at the top, the blue. Okay. So I think that's . . . That tells me enough and we can find it later. I see where you're looking and you've got 22.2 page 75. We'll find it. Yeah, I think it's the second volume of the supplemental excerpts and it's 226 on the bottom right. All right. So this particular examination deals with . . . where he is testifying. Agent Lee is testifying about text messages found on the phone and it goes on to have him just read basically the text and then eventually it gets to a point where . . . So now I'm on . . . to SCR 230 and he's just . . . he's just reading it and L did too. I can continue doing business with you. This is line 11, but you have to cover first of all what I sent it. Then eventually it goes on to the . . . on the very next page to SCR page 231 . . . . . . line 8 question. And once again, this is who asking who to send an address answer. This is Amigo asking Mr. Jacinto to send Amigo an address. It goes on . . . on the next page, line 12. Where's the objection though? So that . . . that is on me. That is . . . there . . . there . . . what I was going to answer was that with respect to the next set of questions by Judge Christin, there was . . . whether there was any interpretation objection. There . . . there . . . there was the percipient witness one that Ms. Afinito identified and I . . . I . . . I will say strategically, you know, it . . . it . . . it is difficult to keep getting up in front of the jury and objecting based on that. But there also was a best evidence objection where I lodged an objection basically stating . . . and this is . . . and again, this is a bad reference . . . 22.5 page 110 which is actually . . . Okay, it's 4SER713. So . . . 4SER713. Yeah, it actually starts at the bottom of 712. And so the question . . . all right, and if you could tell us what the rest of the conversation answered by the witness. Okay, my objection, Your Honor, I would object to the witness's narrative, Your Honor, the conversation is best evidence. It was basically my objection is, you know, the text of the messages or whatever conversation they're having is . . . that's for the jury to figure out. It's not for this witness to interpret as an expert and to give an opinion with respect to what they're talking about or what the meaning is. So, I would respectfully argue that that is a . . . that is an objection as to the interpretation or the meaning of any of these messages. Anything further? Unless there were on any of the other issues . . . any questions? No. There doesn't appear to be any additional questions. Thank you both for your careful preparation. We appreciate it very much. We will take this matter under advisement and stand in recess.
judges: FLETCHER, CHRISTEN, DESAI